**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

HAROLD SMITH; LAURA SMITH; and
SHANIKQUA SMITH,

        Plaintiffs,

v.                                                                           Case No. 6:14-cv-1704-Orl-37TBS

ALAN J. CONFREDA; WAYNE IVEY,
SHERIFF OF BREVARD COUNTY,
FLORIDA; BRIAN GUILFORD; and
BRIAN STOLL,

        Defendants.

**ORDER**

This cause is before the Court on the following:

1. Motion for Summary Judgment and Memorandum of Law by Defendants Ivey, Confreda, Guilford and Stoll (Doc. 70), filed February 1, 2016;

2. Plaintiffs' Response to Defendants' Motion for Summary Judgment (Doc. 86), filed February 23, 2016; and

3. Reply by Defendants Ivey, Confreda, Guilford and Stoll to Plaintiffs' Response to Defendants' Motion for Summary Judgment (Doc. 88), filed March 8, 2016.

This action arises out of a police task force's attempt to apprehend a violent criminal pursuant to an arrest warrant. (*See* Doc. 1.) Unfortunately, this attempt resulted in public humiliation and embarrassment for an innocent man and his family when task force officers briefly detained them based on a surveillance officer's mistaken report that

he saw the suspect enter the family's home. (*See id.*) The innocent man and his family now challenge their detentions as as violations of state law and their federal civil rights. (*Id.*; *see also* Doc. 29.)

## BACKGROUND[1]

In July of 2013, the Cocoa Police Department requested the assistance of the Gang and Major Epidemic of Violence Enforcement Response (GAMEOVER) task force ("**GTF**")[2] to locate and execute arrest warrants for a Mr. Normelus Pierrevilus, Jr. ("**Suspect**") on charges of violent use and possession of a firearm and the sale and possession of cocaine. (Doc. 71-1, p. 22; Doc. 76, p. 61; Doc. 72, p. 10.) Defendant BCSO Sergeant Alan Confreda ("**Defendant Confreda**") was the GTF supervising sergeant, and Defendants BCSO Agent Brian Guilford ("**Defendant Guilford**") and BCSO Deputy Brian Stoll ("**Defendant Stoll**") were members of GTF. (Doc. 71-1, pp. 11, 15–16, 18–19.) A sworn affidavit in support of the operative arrest warrant described Suspect as a 160-pound, 5'1 black male. (Doc. 75, pp. 11, 13.)

GTF's investigation of Suspect revealed: (1) a phone number ("**Phone**") for Suspect; and (2) that Suspect was staying with an unknown female on Palmer Street in the City of Rockledge. (Doc. 71-1, p. 22.) GTF obtained an order authorizing it to:

---

[1] The Court construes the facts in the light most favorable to Plaintiffs, the non-moving parties. *See Battle v. Bd. of Regents*, 468 F.3d 755, 759 (11th Cir. 2006); *see also Robinson v. Arrugueta*, 415 F.3d 1252, 1257 (11th Cir. 2005) ("When conducting a qualified immunity analysis, district courts must take the facts in the light most favorable to the party asserting the injury," such that the Court "has the plaintiff's best case before it.").

[2] GTF is a "cooperation between" the Brevard County Sheriff's Office ("**BCSO**") and police departments from several cities, including Titusville, Cocoa, Melbourne, and Palm Bay, that tracks down and apprehends gang members and suspects of violent crimes. (Doc. 71, p. 9.)

2

(1) acquire information about the Phone from the provider, including its geographic location; and (2) conduct electronic surveillance of the Phone. (*Id.*; Doc. 74, p. 15.)

On August 22, 2014, GTF monitored the Phone. (Doc. 71-1, p. 23.) "During the daytime and early evening hours, the [Phone's] movements were very active, never staying in one place for more than fifteen minutes." (*Id.*) Around 7:00 p.m., GTF located the Phone on Palmer Street, where it remained during several locator updates. (*Id.*) Around 8:00 p.m., an unnamed GTF agent determined that the Phone was located between 976 and 974 Palmer Street ("**Area**"). (*Id.*) Consequently, another unnamed GTF agent ("**Surveillance Officer**") parked in the Area to conduct surveillance. (*Id.*) That evening, Surveillance Officer observed a black male—whom he believed to be Suspect—enter 976 Palmer Street ("**Residence**"). (*Id.*) Surveillance Officer is not a party to this action.

Based on Surveillance Officer's observations, Defendant Confreda gathered GTF members—including Defendants Guilford and Stoll—for a briefing ("**Briefing**").[3] (Doc. 73, p. 25.) At the Briefing, which lasted about thirty minutes, Defendant Confreda showed the present GTF members a picture of Suspect, advised the members that they had warrants for Suspect's arrest, and articulated his plan for GTF to apprehend Suspect at the Residence. (*Id.* at 23, 28.)

In hopes of apprehending Suspect, on the night of August 22, 2013, at the direction of Defendant Confreda, GTF members—including Defendants Guilford and Stoll—set up a perimeter around the Residence. (Doc. 72, pp. 23, 3.) Defendant Confreda parked his

---

[3] Surveillance Officer continued surveilling the Residence and was not present at the Briefing. (Doc. 71, pp. 23–24; Doc. 72, p. 37.)

car halfway in the driveway of the Residence and halfway on the street and positioned himself outside his car at the end of the driveway. (Doc. 71, pp. 20, 28.) Based on Defendant Confreda's assignments: (1) Surveillance Officer entered the backyard curtilage of the Residence (*id.*); (2) Defendant Guilford positioned himself next to Defendant Confreda at the end of the driveway (*id.* at 46); and (3) Defendant Stoll positioned himself on the curtilage at the front southwest corner of the Residence (*id.* at 50). Several other GTF members surrounded the Residence and a helicopter hovered over the vicinity of the Residence. (*Id.* at 40–51.) All of the GTF members were armed and had activated their police lights so that "anybody looking out the window would know that [it was] the police" outside the Residence. (*Id.* at 83, 101; *see also* Doc. 80, p. 28.)

Once the GTF members were in position, Defendant Confreda used his vehicle's public address system to call for the occupants of the Residence to "come out with [their] hands up." (Doc. 80, pp. 30–32; Doc. 71, p. 84.) When Plaintiff Harold Smith ("**Mr. Smith**") exited the Residence, Defendant Confreda ordered him to walk backwards towards Defendant Guilford. (Doc. 71, pp. 84, 99; Doc. 80, pp. 34–35.) Mr. Smith obliged. (Doc. 71, p. 99.) As Mr. Smith approached, Defendants Confreda and Guilford recognized that he was not Suspect.[4] (Doc. 71, p. 84; Doc. 73, p. 45). Nevertheless, Defendant Guilford secured Mr. Smith in handcuffs and frisked him for weapons, but advised him that he was not under arrest. (Doc. 73, pp. 45, 56–58; Doc. 71, pp. 97, 101.)

---

[4] Approximately a year before the August 2013 Incident, Defendant Guilford had been "on scene" during Suspect's prior arrest and, thus, described Suspect to Defendant Confreda as "a little fellow," or "some words to that affect." (Doc. 73, pp. 13, 22.) Mr. Smith was taller, older, and heavier than Suspect. (*Id.* at 13–22, 45.

Defendant Confreda subsequently observed Plaintiff Laura Smith ("**Mrs. Smith**") standing at the door of the Residence and called her outside. (Doc. 80, p. 37.) When she obliged, Defendant Confreda directed her to stand next to Mr. Smith. (Doc. 80, p. 37.) Mrs. Smith then notified Defendant Confreda that her sixteen-year old daughter, Shanikqua Smith ("**Daughter**"), was inside. (*Id.* at 40.) At Defendant Confreda's request, Daughter exited the Residence. (*Id.* at 40–41.)

When questioned, Daughter and Mrs. Smith told Defendant Confreda that they did not know Suspect. (*Id.* at 44–45.) Mr. and Mrs. Smith also permitted GTF members to enter the Residence to confirm that no one else was inside. (*Id.* at 45; Doc. 79, p. 28.) Three GTF members went inside the Residence and, after a few minutes, they exited and confirmed that no one else was inside. (Doc. 80, p. 46; Doc. 79, pp. 29–30.) At that time, Defendant Guilford uncuffed Mr. Smith and Defendant Confreda released Plaintiffs from detention. (Doc. 80, pp. 46, 48; Doc. 79, pp. 29–30.) Mr. Smith was handcuffed for approximately fifteen to twenty-five minutes. (Doc. 80, p. 47; Doc. 79, p. 35.) Neither Mrs. Smith nor Daughter were ever handcuffed or frisked. (Doc. 80, pp. 37, 43.)

Mrs. Smith and Daughter subsequently returned to the Residence while Mr. Smith stayed outside and spoke with neighbors who had witnessed the encounter. (Doc. 79, pp. 32–34.) GTF then turned its attention to the residence located at 974 Palmer Street and told Mr. Smith that he was free to go. (*Id.* at 36.) The entire encounter—from the time Mrs. Smith first observed the police lights outside the Residence to the time GTF moved to 974 Palmer Street—lasted about forty-fives minutes to an hour ("**August 2013 Incident**"). (*Id.* at 35.)

That evening, GTF obtained and executed a warrant to search 974 Palmer Street, but they did not locate Suspect.[5] (Doc. 73, p. 66; Doc. 71-1, p. 23.) Suspect was ultimately apprehended in October of 2013 and is currently in prison. (Doc. 72, pp. 17, 30.)

On October 20, 2014, Mr. and Mrs. Smith and Daughter (collectively, "**Plaintiffs**") initiated this federal action pursuant to 42 U.S.C. § 1983 and Florida state law. (Doc. 1.) The operative fourteen-count Complaint asserts ten federal civil rights claims against Defendants Confreda, Guilford, and Stoll (collectively, "**Defendant Officers**") for alleged violations of Plaintiffs' Fourth Amendment constitutional rights and four state law claims against BSCO Sherrif Wayne Ivey ("**Defendant Ivey**") based on the Defendant Officers' actions during the August 2013 Incident. (Doc. 29.) Defendants move for summary judgment as to all claims. (Doc. 70.) Plaintiffs responded (Doc. 86), Defendants replied (Doc. 88), and the matter is ripe for adjudication.

## STANDARDS

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). As to issues for which the movant would bear the burden of proof at trial, the "movant must affirmatively show the absence of a genuine issue of material fact, and support its motion with credible evidence demonstrating that no reasonable jury could find for the non-moving party on all of the essential elements of its case." *Landolfi v. City of*

---

[5] It was GTF's standard procedure to first attempt to call suspects out of a residence. (Doc. 75, pp. 36, 38.) If the occupants did not respond, GTF officers would then apply for a warrant to search the location where they believed a suspect was located. (*Id.* at 36–37.)

6

*Melbourne, Fla.*, 515 F. App'x 832, 834 (11th Cir. 2012) (citing *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993)). As to issues for which the non-movant would bear the burden of proof at trial, the movant has two options: (1) the movant may simply point out an absence of evidence to support the non-moving party's case; or (2) the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *United States v. Four Parcels of Real Prop. in Green & Tuscaloosa Ctys.*, 941 F.2d 1428, 1438 (11th Cir. 1991) (citing *Celotex Corp.*, 477 U.S. at 325).

"The burden then shifts to the non-moving party, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citing *Fitzpatrick*, 2 F.2d at 1115–17). "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Four Parcels*, 941 F.2d at 1437 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The Court must view the evidence and all reasonable inferences drawn from the evidence in the light most favorable to the non-movant. *Battle v. Bd. of Regents*, 468 F.3d 755, 759 (11th Cir. 2006). However, "[a] court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.'" *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996).

**DISCUSSION**

**I.      Section 1983 Claims and Qualified Immunity**

The gravamen of Plaintiffs' § 1983 claims is that Defendant Officers violated Plaintiffs' Fourth Amendment rights to be free from unreasonable searches and seizures by calling Plaintiffs out of their home and handcuffing and conducting a patdown frisk of Mr. Smith.[6] (*See* Doc. 29.) Defendant Officers move for summary judgment as to the § 1983 claims on the ground that they are entitled to qualified immunity. (Doc. 70, pp. 12–22.)

Section 1983 provides aggrieved persons with a procedural mechanism to seek redress for constitutional violations that are committed while a defendant is acting under color of state law. 42 U.S.C. § 1983. Acts performed by law enforcement officers—even if illegal or unauthorized—are considered to have been performed under color of state law so long as the acts are done in the defendant's capacity as a law enforcement officer. *See West v. Atkins*, 487 U.S. 42, 49–50 (1988). To avoid an individual liability claim under § 1983, law enforcement officers may invoke the defense of qualified immunity, which protects "all but the plainly incompetent or one who is knowingly violating federal law." *See Depalis-Lachaud v. Noel*, 505 F. App'x 864, 867 (11th Cir. 2013). Qualified immunity

---

[6] Mr. Smith asserts a § 1983 claim against Defendants Confreda and Guilford based on his temporary detention, handcuffing, and frisk. (Doc. 29, ¶¶ 80–86 (Count I); *id.* ¶¶ 87–92 (Count II).) Mrs. Smith and Daughter each assert a § 1983 claim against Defendant Confreda based on their temporary detention (*Id.* ¶¶ 93–97 (Count III); *id.* ¶¶ 98–102 (Count IV).) Each Plaintiff asserts a claim against: (1) Defendant Stoll for entering the curtilage of the Residence in an alleged violation of their Fourth Amendment rights (*id.* ¶¶ 103–07 (Count V); *id.* ¶¶ 108–112 (Count VI); *id.* ¶¶ 113–17 (Count VII)); and (2) Defendant Confreda for supervisory liability based on his role as supervisor of the GTF members during the August 2013 Incident (*id.* ¶¶ 118–22 (Count VIII); ¶¶ 123–27 (Count IX); ¶¶ 128–32 (Count X)).

is a question of law to be decided by the Court, and it is evaluated under an "objective-reasonableness" standard. *Courson v. McMillian*, 939 F.2d 1479, 1486–87 (11th Cir. 1991).

"In order to receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). "[T]he burden [then] shifts to the plaintiff to show that qualified immunity is not appropriate." *Id.*; *see also Terrell v. Smith*, 668 F.3d 1244, 1250 (11th Cir. 2012). To do so, the plaintiff must establish that: (1) the facts of the case make out a violation of a constitutional right; and (2) the constitutional right was "clearly established" at the time of the putative misconduct.[7] *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

It is undisputed that Defendant Officers were acting within the scope of their discretionary authority during the August 2013 Incident. *See Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1303 (11th Cir. 2006); *see also Bouye v. Marshall*, 102 F. Supp. 2d 1357, 1362 (N.D. Ga. 2000) (finding that an off-duty security officer was acting under color of state law because he was in his police officer attire, he bore his police officer gear, he was performing a police function in patrolling an apartment and investigating suspicious behavior, and he used his authority to detain and search the plaintiff). Thus, to avoid summary judgment, Plaintiffs must show that Defendant Officers violated Plaintiffs' clearly-established Fourth Amendment rights during the August 2013

---

[7] The Court may address the prongs of the qualified immunity inquiry in any order. *Pearson*, 555 U.S. at 236. However, the United States Supreme Court encourages courts to address the constitutional violation prong first so as to develop a body of clearly established law on the often fact-specific inquiries that arise in the context of § 1983 claims. *See id.*

9

Incident. *See Terrell*, 668 F.2d at 1250; *see also Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014). The Court must conduct a separate analysis for each Defendant. *See Dolihite v. Maughon*, 74 F.3d 1027, 1035 n.2 (11th Cir. 1996); *see also Young v. Eslinger*, 244 F. App'x 278, 279 (11th Cir. 2007).

### a.   **Defendants Confreda and Guilford**

Defendants concede that Plaintiffs were briefly seized for purposes of the Fourth Amendment.[8] (*See* Doc. 70, p. 14.) An officer may seize a person if he has a reasonable suspicion—based on "specific, articulable facts"—that the person is, or is about to be, involved in criminal activity; this sort of constitutionally permissible seizure is known as a temporary investigative stop. *Fertil v. Guzman*, No. 14-60494, 2014 WL 5522889, at *5 (S.D. Fla. Oct. 31, 2014); *see also United States v. Hensley*, 469 U.S. 221, 229 (1985) (indicating that officers can conduct an investigative stop based on a reasonable suspicion that the person is wanted in connection with a completed felony).[9] "The

---

[8] Indeed, based on the significant police presence around the perimeter of the Residence and Defendant Confreda's call for Plaintiffs to exit the Residence, there is no question that Plaintiffs were seized. *See Terry v. Ohio*, 392 U.S. 1, 16 (1968) (stating that there is a seizure "whenever a police officer accosts an individual and restrains his freedom to walk away").

[9] "[T]he foundation required to jutify a detention differs depending on the nature of the detention." *Fertil*, 2014 WL 5522889, at *4. As a matter of law, the Court finds that Mr. Smith's detention was a temporary investigative stop, not an arrest. *See id.* (indicating that whether a seizure constitutes an investigative stop or an arrest is a question of law). This finding is compelled by the fact that: (1) Mr. Smith was handcuffed and seized for less than an hour (Doc. 79, p. 35); (2) Defendant Guilford released Mr. Smith once he learned that Suspect was not in the Residence (Doc. 80, p. 46; Doc. 79, pp. 29–30); (3) neither Defendant Confreda nor Defendant Guilford used force to detain or handcuff Mr. Smith (*see* Doc. 73, pp. 45–46); and (4) the seizure occurred in conjunction with Defendant Officers' attempt to apprehend a violent convicted felon with an outstanding warrant for his arrest (*see* Doc. 71-1, pp. 22–24). *See Fertil*, 2014 WL 5522889 at *4 (concluding, for similar reasons, that the nature of a detention constituted a temporary investigative stop rather than an arrest). Indeed, "the detention was an investigative stop meant to expeditiously confirm or dispel the [Defendant Officers'] suspicions" that Suspect

10

existence of a reasonable suspicion is a question of law determined by reference to the totality of the circumstances." *Id.* (citing *Evans v. Stephens*, 407 F.3d 1272, 1280 (11th Cir. 2005)). "The question turns on whether [Defendants Confreda and Guilford's] actions were objectively reasonable under the facts and circumstances as they existed at the relevant time." *Bouye*, 102 F. Supp. 2d at 1362. The reasonableness of a Fourth Amendment seizure is evaluated using a two-step inquiry: (1) first, the Court must determine whether the seizure was justified at its inception; and (2) second, the Court must determine whether the seizure as actually conducted was reasonably related in scope to the circumstances which justified interference in the first place. *Terry*, 392 U.S. at 20.

Under the first prong, the Court must determine whether Defendant Confreda had a reasonable basis for calling Plaintiffs out of the Residence. *See Gray*, 458 F.3d at 1305. Surveillance Officer's identification of Suspect [albeit mistaken] coupled with the fact that Suspect's Phone was tracked at one of two homes in the Area, including the Residence, was sufficient evidence to give Defendant Confreda a reasonable suspicion that Suspect was at the Residence and permit him to conduct an "investigatory stop." *See United States v. Blackman*, 66 F.3d 1572, 1576 (11th Cir. 1995); *see also United States v. Fields*, 178 F. App'x 890, 893 (11th Cir. 2006) ("Reasonable suspicion need not be based off an officer's personal observations, but rather may be based on information supplied by another person, so long as the information bears sufficient indicia of reliability."). Based on the circumstances—namely that Defendant Confreda believed Suspect to be in the

---

was in the Residence. *See id.* Defendant Guilford's handcuffing of Mr. Smith does not automatically convert the seizure of Mr. Smith into an arrest. *Id.*

Residence, did not know who else was in the Residence, knew Suspect had commited violent crimes, and needed to protect himself and others involved in the August 2013 Incident—it was not unreasonable for Defendant Confreda to call for the occupants to exit the Residence. *See Blackman*, 66 F.3d at 1576.[10] Thus, the seizure of Plaintiffs at its inception was constitutionally permissible.

As for the second prong of the inquiry, the Court must determine whether the subsequent handcuffing and frisk of Mr. Smith and detention of Mrs. Smith and Daughter was "reasonably related to the scope of the circumstances which justified the interference in the first place." *Gray*, 458 F.3d at 1305. "A seizure will be permissible in its scope when the measures adopted are reasonably related to the objectives of the seizure and not excessively intrusive." *Id.* (citation omitted). Plaintiffs argue that the scope of their seizure was not justified given that Defendants Confreda and Guilford knew that Mr. Smith was not Suspect. (Doc. 86, p. 21.)

Although Defendants Confreda and Guilford recognized when Mr. Smith exited the Residence that he was not Suspect (Doc. 71, p. 84; Doc. 73, p. 45), their belief that Suspect may have still been in the Residence was not yet dispelled (Doc. 73, p. 45). It was objectively reasonable for Defendants Confreda and Guilford to conclusively determine whether Suspect was present in the Residence because: (1) the tracking

---

[10] In ruling on a motion to suppress, the *Blackman* court concluded that the agents' initial detention of defendants—calling defendents out of an apartment and handcuffing them once they were out the doors—was a constitutionally permissible investigatory stop based on the following facts: (1) there were four adult male suspects involved; (2) the agents had a reasonable suspicion that the occupants of the apartment were the persons suspected of committing violent armed robberies; (3) the agents did not know how many people lived in the apartment; and (4) in light of the foregoing, the agents needed to protect themselves. *See* 66 F.3d at 1576–77.

results indicated that Suspect was in one of two houses, including the Residence; and (2) Surveillance Officer reported that he saw Suspect enter the Residence. (*See* Doc. 71-1, p. 23.) As such, the continued detention of Plaintiffs was reasonably related to the circumstances that justified calling Plaintiffs out of the Residence in the first place—to determine whether Suspect was in the house. *See Gray*, 458 F.3d at 1305. This finding is further compelled by the fact that, once GTF members searched the Residence and eliminated any suspicion that Suspect was inside the Residence, Defendant Guilford uncuffed Mr. Smith and Plaintiffs were released. (*See* Doc. 80, pp. 46, 48; Doc. 79, pp. 29–30); *see also Kapila v. Jenkins*, No. 07-61895-CIV, 2009 WL 1288233, at *7 (S.D. Fla. May 7, 2009) (explaining that an investigative stop "must be made for investigative purposes only, and its duration must be limited to the time needed for such investigation of possible criminal activity"). Thus, Defendants Confreda and Guilford's act of seizing Plaintiffs, despite their recognition that Mr. Smith was not Suspect, was objectively reasonable. As this is the extent of Defendant Confreda's actions as they relate to the seizure of Plaintiffs, the Court finds that Defendant Confreda is entitled to qualified immunity as to each of Plaintiffs' Fourth Amendment temporary detention claims.

The analysis of Defendant Guilford's handcuffing and search of Mr. Smith turns on the second prong of the inquiry. A police officer may properly handcuff a suspect during an investigative stop to ensure safety, to prevent flight, or to maintain the status quo. *See Gray*, 458 F.3d at 1305–06; *Fields*, 178 F. App'x at 893–94. "The use of handcuffs without anything more than a suspicion that criminal activity has occurred—unaccompanied by safety concerns or a flight risk—can turn an otherwise legal stop into an unreasonable seizure." *Fertil*, 2014 WL 5522889, at *6 (citing *Gray*, 458 F3d at 1305–06)). Moreover,

an officer may conduct a patdown search only for safety purposes based on a belief that the person is armed or dangerous. *Ybarra v. Illinois*, 444 U.S. 85, 93 (1979); *United States v. Bonds*, 829 F.2d 1072, 1074 (11th Cir. 1987).

Defendant Guilford testified that he handcuffed and frisked Mr. Smith for safety reasons based on his concern that Suspect was still inside the Residence. (Doc. 73, p. 45.) This subjective concern is insufficient absent evidence that would permit a reasonable officer to consider Mr. Smith a potential threat to safety, a flight risk, disruptive, or noncooperative. No such evidence exists here; rather, the evidence reveals just the opposite—that Mr. Smith was cooperative, benign, and a "real nice guy," that he and Defendant Guilford had a "real good encounter," and that Defendant Guilford did not believe Mr. Smith had engaged in criminal activity or was armed or dangerous. (*Id.* at 45–46, 60–61, 63.) Defendant Guilford's handcuffing and searching of Mr. Smith, therefore, was excessively intrusive and unreasonable. *See Gray*, 458 F.3d at 1306 (finding an officer's handcuffing of a student to be in violation of the Fourth Amendment because "it was not done to protect anyone's safety").

Although the Court finds a constitutional violation, Defendant Guilford is still entitled to qualified immunity unless the law at the time of the August 2013 Incident "clearly established" the unreasonableness of Defendant Guilford's actions; the Court must determine whether, at the time of the August 2013 Incident, "it would have been clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Gray*, 458 F3d at 1305.

> For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless

>the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (citations omitted). Clearly established law includes controlling, materially similar case law and precedent that establishes a broader constitutional principle that is clearly applicable to the facts present. *See Morton v. Kirkwood*, 707 F.3d 1276, 1282 (11th Cir. 2013).

Plaintiff did not provide, nor did the Court itself locate, case law establishing a bright line rule regarding the use of handcuffs or a frisk during an investigatory stop that would put Defendant on notice that the unreasonableness of his conduct was clearly established. *See Jackson v. Sauls*, 206 F.3d 1156, 1165 (11th Cir. 2000) ("If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant."). Nor did Plaintiffs meet their burden to identify materially similar case law that would have put Defendant Guilford on notice that his handcuffing and frisk of Mr. Smith in connection with the attempted apprehension of a violent suspect was objectively unreasonable *in light of his belief that the violent suspect may still have been in Mr. Smith's residence.*

"Even in the absence of factually similar case law, an official can have fair warning that his conduct is unconstitutional when the constitutional violation is obvious." *Gray*, 458 F.3d at 1307 (citing *United States v. Lanier*, 520 U.S. 259, 271 (1997)). As the "Fourth Amendment's general proscription against [unreasonable] seizures seldom puts officers on notice that certain conduct is unlawful under precise circumstances," the obviousness standard is satisfied only in the "rare" cases where an officer's conduct "was well beyond the 'hazy border' that sometimes separates lawful conduct from unlawful conduct, such

15

that every objectively reasonable officer would have known that the conduct was unlawful." *Id.* (quoting *Evans v. Stephens*, 407 F.3d 1272, 1283 (11th Cir. 2005) (en banc)).

The Court finds that Defendant Confreda's conduct was not such an obvious violation of the Fourth Amendment. Defendant Guilford handcuffed Mr. Smith without force for a relatively short period of time during the course of an investigative stop in which Defendants were attempting to apprehend a violent suspect whom they believed could have been in the Residence. (*See* Doc. 71-1, pp. 22–24.) Additionally, Defendant Guilford briefly frisked Mr. Smith for weapons for safety purposes per his standard procedure. (Doc. 73, p. 56.) While the minimally intrusive handcuffing and frisk may have been unreasonable under the Fourth Amendment, it did not fall outside the "hazy border" separating lawful and unlawful conduct. *See Fertil*, 2014 WL 5522889 at *7–8 (finding that an officer who handcuffed a suspect during a search for a missing phone was entitled to qualified immunity because, even though the handcuffing was unreasonable, it was done without force and for a limited time, such that it was not "so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent"). While it is true that Defendant Confreda did not believe that Mr. Smith was a safety concern or flight risk, nonetheless, the line establishing the boundary between lawful and unlawful use of handcuffs during an investigatory stop is cloudy at best. Binding authority from the U.S. Supreme Court and Court of Appeals for the Eleventh Circuit describes scenarios in which the use of handcuffs during an investigatory stop was approved. *See Muehler v. Mena*, 544 U.S. 93, 101 (2005) (permitting officers to handcuff occupants of a residence during an investigatory stop in "inherently dangerous"

situations to "minimize[] the risk of harm to both officers and [the] occupants"); *Blackman*, 66 F.3d at 1576 (condoning the use of handcuffs during an investigatory stop so the agents could protect themselves in light of the violent nature of the suspects inside the residence). Therefore, Defendant Guilford enjoys qualified immunity from Mr. Smith's § 1983 claim.

### b. Defendant Stoll

Defendant Stoll, who was an assisting officer during the August 2013 Incident, is entitled to qualified immunity. Assisting officers are "entitled to qualified immunity when there is no indication that they acted unreasonably in following the lead of a primary officer or that they knew or should have known that their conduct might result in a [constitutional] violation, even when the primary officer is not entitled to qualified immunity." *Shepard v. Hallandale Beach Police Dep't*, 398 F. App'x 480, 483 (11th Cir. 2010) (citing *Brent v. Ashley*, 247 F.3d 1294, 1306 (11th Cir. 2001) (finding that defendant officers who accompanied a deputy that performed an unauthorized search were entitled to qualified immunity because the record lacked evidence supporting the conclusion that defendants acted unreasonably or had reason to suspect that the plaintiff's rights were being violated).

Here, Defendant Stoll followed the direction of his supervising agent, Defendant Confreda, when he positioned himself on the curtilage of the Residence. *Cf. O'Rourke v. Hayes*, 388 F.3d 1201, 1210 n.5 (11th Cir. 2004) (suggesting that the outcome may be different when an officer acts on his own accord rather than at the direction of a superior). Plaintiffs do not provide evidence that Defendant Stoll saw Mr. Smith prior to his detention, knew that Mr. Smith was not Suspect, or was personally involved in the temporary

17

detention of any Plaintiff. Even construing the evidence in the light most favorable to Plaintiffs, Defendant Stoll did not act unreasonably in following Defendant Confreda's orders because he had no reason to believe that Suspect was not at the Residence or that he would be violating Plaintiffs' constitutional rights. *See, e.g.*, *Hartsfield v. Lemacks*, 50 F.3d 950, 965 (11th Cir. 1995) (concluding that two officers were entitled to qualified immunity because "nothing in the record indicate[d] that [they] acted unreasonably in following [a superior officer's] lead, or that they knew or should have known that their conduct might result in a violation of [plaintiff's] Fourth Amendment rights"); *see also Blackman*, 66 F.3d at 1576; *Fields*, 178 F. App'x at 893. Indeed, Defendant Stoll only knew that Suspect had used a cellphone around the Residence and that Surveillance Officer believed he saw Suspect entering the Residence. Thus, Defendant Stoll is entitled to qualified immunity from Plaintiffs' Fourth Amendment claims.[11]

## II. State Law Claims

The Court has federal question jurisdiction over the § 1983 claims, *see* 28 U.S.C. 1331, and supplemental jurisdiction over the state law claims,[12] *see* 28 U.S.C. § 1367. Because summary judgment is due to be entered in favor of

---

[11] Consequently, Defendant Confreda is entitled to summary judgment on Plaintiffs' supervisory liability claims, which are predicated on Defendant Confreda's direction that Defendant Stoll and other unnamed assisting GTF officers enter the curtilage of the Residence during the August 2013 Incident. *See Gish v. Thomas*, 516 F.3d 952, 955 (11th Cir. 2008) (granting summary judgment on a supervisory liability claim when the Court found that "there was no underlying constitutional violation").

[12] Mr. Smith asserts a false arrest or, alternatively, a false imprisonment claim against Defendant Ivey, which is predicated on his temporary detention by Defendants Confreda and Guilford. (Doc. 29, ¶¶ 133–39 (Count XI).) Additionally, each Plaintiff asserts a claim for invasion of privacy against Defendant Ivey based on the GTF members' entrance onto the curtilage of the Residence and use of force and intimidation to coerce Plaintiffs out of the Residence. (*Id.* ¶¶ 140–50 (Count XII); ¶¶ 151–61 (Count XIII); ¶¶ 162–72 (Count XIV).)

Defendants as to each of the federal § 1983 claims, the Court declines to continue to exercise jurisdiction over the state law claims.[13] *See Mauhgon v. City of Covington*, 505 F. App'x 818, 823 (11th Cir. 2013) (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 349–50 (1988) for the proposition that a district court does not abuse its discretion in declining to exercise supplemental jurisdiction over state law claims after granting summary judgment in favor of defendant as to each of the federal claims). Consequently, Plaintiffs' state law claims are due to be dismissed without prejudice.

## CONCLUSION

Accordingly, it is hereby **ORDERED AND ADJUDGED** that:

1. Motion for Summary Judgment and Memorandum of Law by Defendants Ivey, Confreda, Guilford and Stoll (Doc. 70) is **GRANTED IN PART AND DENIED IN PART**.

    a. To the extent that Defendants seek summary judgment on the 42 U.S.C. § 1983 claims, the motion is **GRANTED**.

    b. In all other respects, the motion is **DENIED**.

2. The Clerk is **DIRECTED** to enter judgment in favor of Defendants and against Plaintiffs on Counts I–X (Doc. 29, ¶¶ 80–132).

3. The Court **DECLINES** to exercise supplemental jurisdiction over the remaining state law claims. As such, the Clerk is **DIRECTED** to **DISMISS WITHOUT PREJUDICE** Counts XI–XIV (Doc. 29, ¶¶ 133–172).

4. The Pretrial Conference scheduled for Thursday, June 16, 2016, is

---

[13] The Court notes that the statute of limitations for the state law claims has not yet run. *See* Fla. Stat. § 95.11(o) (providing a four-year statute of limitations for claims of false arrest, false imprisonment claims, and other intentional torts).

        **CANCELLED**.

5.     The Clerk is **DIRECTED** to terminate all pending deadlines and close the file.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on June 15, 2016.



ROY B. DALTON JR.
United States District Judge

Copies:

Counsel of Record